IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SHARON KAY CHARLTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 04-1122-CV-W-ODS-SSA |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING FINAL DECISION OF COMMISSIONER OF SOCIAL SECURITY

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits. For the following reasons, the Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff Sharon Kay Charlton filed her application for disability insurance benefits on January 31, 2002, alleging that she has been disabled since May 31, 2000. Plaintiff's claims were denied. After a hearing was held, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review of the ALJ's decision. The decision of the ALJ remains the final decision of the Commissioner relevant to this appeal.

### A. Administrative Hearing

In the hearing held before the ALJ, Plaintiff testified that she was forty-eight years old, had graduated from high school and attended one year of community college. She last worked as a laborer and was fired because of her physical restrictions of no lifting

over ten pounds, no repetitive lifting above the waist and no overhead lifting. Tr. 244, 245. She had previously worked at a flower shop and daycare before working as a laborer. Tr. 269.

Due to pain in her back, chest and neck, Plaintiff testified that she can only stand for thirty minutes before she has to sit down. She can walk for about five minutes; however, if she walks with her arms down, it causes pain to radiate from her arms and elbows to her shoulders, chest and neck. Tr. 248-49. She can lift ten pounds and can also bend over, squat, and climb stairs with some difficulty. She can shop for thirty-five to forty minutes but must sit down occasionally. Tr. 249-50, 267. She can type for fifteen to thirty minutes and write for about thirty minutes. Tr. 249, 266. She cleans the house daily but must sit down every fifteen to twenty minutes. Tr. 254. She visits family and friends, drives for short periods of time, reads books and does light cooking. Tr. 254-56. On a good day, she will go antiquing with her husband. Tr. 255. Her pain medication occasionally clouds her thinking, causes dry mouth and makes her tired. Tr. 251, 260. Plaintiff also suffers from migraines three or four times per month during which time the migraine lasts for two days. Tr. 251.

Plaintiff's husband of thirty years, Donald Charlton, also testified at the hearing. He has noticed that Plaintiff's condition has worsened over the years. Tr. 290. He stated that her medication affects her memory, attention and concentration. Tr. 291. He testified that Plaintiff can only sit in a rigid position for ten minutes. In addition, she takes a nap daily for one to three hours. Tr. 292.

Vocational Expert (VE) Janice Hastert testified that Plaintiff's past relevant work included electrical assembler, floral delivery person and daycare attendant. Tr. 274-76. The ALJ posed a hypothetical question asking whether an individual the same age, education level and work experience as Plaintiff could perform Plaintiff's past relevant work if that person could lift ten pounds repetitively but could not lift more than twenty pounds. The VE responded that such an individual could work as a floral delivery person and electrical assembler. Tr. 277-78. The VE further stated that an individual the same age, education level and work experience as Plaintiff could not perform any of Plaintiff's

past relevant work if she should not lift more than ten pounds, should avoid repetitive use of the bilateral upper extremities and use of the bilateral upper extremities overhead; however, such an individual could work as a security monitor, information clerk and phone solicitor. Tr. 278.

The ALJ posed an additional hypothetical question asking whether an individual the same age, education level and work experience as Plaintiff could perform Plaintiff's past relevant work if she could occasionally lift twenty pounds and frequently lift ten pounds; could stand and/or walk six hours a day; sit six hours a day; push and pull occasionally; should seldom climb; has limited reaching ability, including overhead; but has no problems with handling, fingering and feeling. The VE concluded that she could work as a floral delivery person. Tr. 279.

In another hypothetical question, the ALJ asked the VE if a person the same age, education level and work experience as Plaintiff could perform Plaintiff's past relevant work if she could frequently lift five pounds, occasionally lift ten pounds, stand or walk two hours a day, sit four hours per day, occasionally balance, but had limitations with regard to reaching, handling, fingering and feeling and could not work with her hands extended overhead. The VE responded that such an individual could not perform any work. However, when asked whether that hypothetical person could sit six hours a day instead of four, the VE stated that such an individual could perform work as a security monitor, information clerk and phone solicitor. Tr. 279-80. On cross-examination, the VE stated that if Plaintiff had to alternate sitting, standing and reclining, it would prevent employment. In addition, marked limitations with attention and concentration would prevent work. Tr. 283.

### *B. Medical Records*

Fernando M. Egea, M.D., first saw Plaintiff on July 21, 1999, for complaints of numbness and tingling in her hands and pain in her elbows and shoulders. Tr. 130-31.

3

Electromyography and nerve conduction studies showed "mild" radiculopathy[1] in the neck. Dr. Egea recommended that Plaintiff remain off work for two weeks, prescribed an anti-inflammatory and ordered an MRI. Tr. 131.

One month later, Plaintiff visited Douglas W. Kiburz, M.D., for the same complaints and informed Dr. Kiburz that she suffered from migraines on a regular basis. Dr. Kiburz noted that Plaintiff had full range of motion of the elbows, wrist and fingers and had sixty-five pounds of grip strength on the right and fifty-five pounds of grip strength on the left. Plaintiff had "exquisite pain" over the back side of both elbows. He concluded that Plaintiff suffered from tennis elbow on both arms and suffered from radiculopathy in the neck. Dr. Kiburz recommended a brace for her elbows and an anti-inflammatory. He concluded that Plaintiff could continue working but must work in a position that required her to lift less weight and perform less repetitive movement. Tr. 119-21.

An MRI conducted on September 8, 1999, showed degenerative changes, mainly in the neck, where there was a slight narrowing of the disc space and mild protrusion of the disc. Tr. 165-66. Dr. Egea prescribed fifteen sessions of physical therapy. Tr. 129, 151-58. On October 6, 1999, Dr. Egea found that Plaintiff could return to work on October 13, 1999, but she could only lift ten pounds repetitively and lift no more than twenty pounds. Tr. 126. Less than three weeks later, Plaintiff complained that physical therapy made her pain worse. Dr. Egea referred her to a surgeon and limited her work to half-days. Tr. 125. On November 3, 1999, Dr. Egea stated that Plaintiff could not return to work until after her evaluation with a neurosurgeon. Tr. 124.

On December 30, 1999, Plaintiff was seen by Terrence Pratt, M.D., for shoulder and neck pain, numbness in her hands and weakness in her upper extremities. She reported a history of migraines. Dr. Pratt's impression was cervical degenerative disc

---

[1] "Disorder of the spinal nerve roots." STEADMAN'S MEDICAL DICTIONARY 1503 (27th ed. 2000).

4

with discogenic[2] discomfort and bilateral thoracic outlet syndrome.[3] He recommended a program of stretching and strengthening the shoulders and increased the doses of Flexeril and Elavil. He opined that Plaintiff should not lift more than ten pounds and must avoid overhead activities and repetitive use of her arms. Tr. 137-39. In January 2000, Plaintiff began another ten session of physical therapy. She reported the most improvement with the use of a transcutaneous electrical nerve stimulation ("TENS") unit. Tr. 141-50. She continued to see Dr. Pratt on three more occasions in the spring of 2000. During that time, Dr. Pratt advised Plaintiff that she could return to work with the restrictions he had previously set forth. Tr. 168, 171, 174-75. An x-ray of her left shoulder, taken in April 2000, was negative. Tr. 171. In June 2000, Dr. Pratt performed a worker's compensation rating report stating that Plaintiff had functional active movement of the shoulders, good motor abilities, symmetrical tendon reflexes and normal gait. He diagnosed her with discogenic discomfort, myofascial pain[4] and thoracic outlet syndrome and found that she suffered from a fourteen percent permanent partial disability. Tr. 189-90.

Timothy B. Gabbert, D.O., saw Plaintiff in March 2001 for the first time since 1999. He refilled her prescriptions for Elavil and Flexeril. Tr. 194. He then saw Plaintiff in January 2002, August 2002 and January 2003 for the same reason. Tr. 226. It was not until 2004 that he saw her again. See infra.

In April 2002, Mohd I. Boda, M.D., examined Plaintiff at the request of the Disability Determination Services. Plaintiff complained that she was in pain all the time and had severe migraine headaches that occurred at least three times per month. She

---

[2] "Denoting a disorder originating in or from an intervertebral disc." STEADMAN'S at 508.

[3] Nerve impingements in the upper extremities, including the arms, chest cage, esophagus and trachea. See STEADMAN'S at 1289, 1828.

[4] Pain of the fibrous tissue surrounding the muscles. See STEADMAN'S at 647, 1173.

5

told Dr. Boda that she could carry twenty pounds for ten minutes, could walk without problems and could drive for forty-five minutes without stopping. Dr. Boda noted restriction in Plaintiff's neck movement and severe pain when Plaintiff lifted her arms above her head. Dr. Boda's impressions included, among other things, cervical radiculopathy, degenerative disc disease, migraines and thoracic outlet syndrome. Tr. 197-205.

In May 2002, Dr. Egea executed Physical and Mental Medical Source Statements ("MSS") even though Dr. Egea had not seen Plaintiff since November 1999. Dr. Egea concluded that Plaintiff's abilities to maintain attention and concentration for extended periods of time and complete a normal workday without interruptions from psychologically based symptoms were markedly limited, and she was moderately limited in her abilities to understand, remember and carry out detailed instructions, and perform activities within a schedule. She was also moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, her ability to respond appropriately to changes in the work setting, her ability to travel to unfamiliar places and her ability to set realistic goals. Tr. 214-15. Physically, Dr. Egea opined that Plaintiff could lift and/or carry less than ten pounds frequently, stand and/or walk continuously for thirty minutes for a total of two hours in a day, and sit continuously for thirty minutes for a total of four hours a day. She was limited in her ability to push and/or pull, reach, handle, finger and feel, and could occasionally balance. He did not find limitations with regard to climbing, stooping, kneeling, crouching and bending. However, she could not work with her hands overhead. Tr. 216-17. Dr. Egea next saw Plaintiff on July 14, 2003, for her migraines and lower back pain. He prescribed Tramadol for the pain. Tr. 221.

In February 2004, Plaintiff visited Dr. Gabbert again (more than a year after her last visit), complaining of headaches and lower back pain. He opined that she was suffering from muscle tension headaches. Tr. 228. An MRI was conducted in August 2004, which showed a disc protrusion and a minimal disc bulge in her lower back. Dr. Gabbert noted that this may require surgery. Tr. 230.

*C. ALJ's Decision*

The ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease and degenerative joint disease of the spine, characterized as "mild" by MRI, with radiculopathy; myofascial pain and/or thoracic outlet syndrome; and migraine headaches without significant complaints documented in the medical records. Tr. 17. She concluded that Plaintiff's allegations of complete disability were not entirely credible due to the conservative medical treatment, discrepancies between Plaintiff's assertions and the information contained in the medical records, her daily activities and work history. The ALJ found Plaintiff's husband's testimony to be cumulative. Tr. 20. She determined that Plaintiff's retained the following residual functional capacity: no lifting over ten pounds, no repetitive use of the bilateral extremities and no overhead activities. Tr. 21. She concluded that, based on Plaintiff's residual functional capacity, she could perform sedentary work as a security monitor, information clerk or telephone solicitor. Tr. 22.

## II. DISCUSSION

Plaintiff appeals the decision of the Commissioner of the Social Security Administration claiming (1) the ALJ did not properly evaluate Plaintiff's and her husband's credibility, and (2) the ALJ improperly rejected the opinions and the Medical Source Statements of Dr. Egea.

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretarys conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a

mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. *Plaintiff's and Her Husband's Credibility*

Under the statutory definition of disability, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be "of such severity that [s]he is not only able to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work." 42 U.S.C. § 423(d)(2)(A). The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. The familiar standard for analyzing a claimant's subjective complaints is set forth in Polaski v. Heckler:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
> The absence of an objective medical bias which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective

8

> complaints solely on the basis of personal observations. Subjective
> complaints may be discounted if there are inconsistencies in the evidence
> as a whole.

739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history and internal citations omitted). Although a claimant's subjective complaints cannot be disregarded solely because they are not fully supported by objective medical evidence, they may be discounted if there are inconsistencies in the record as a whole. See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

Plaintiff contends that the ALJ improperly considered her work history when evaluating her credibility. Although a claimant's work history is not one of the five factors set forth by Polaski, it may be considered by the ALJ when weighing a claimant's credibility. See Ellis v. Barnhart, 739 F.3d 988, 996 (8th Cir. 2005) (citations omitted). Plaintiff's work history was sporadic and characterized by low earnings.

The ALJ found that the medical records did not support Plaintiff's allegations that she suffered from migraines. Plaintiff testified that she suffered from migraines since 1994; however, she was still able to maintain substantial gainful activity despite the migraines. Additionally, the medical records do not indicate that Plaintiff had problems with migraines except to the extent that she told them she had a history of migraines. Tr. 137, 197, 221, 251. She did not seek treatment for her migraines until 2003, and, even after that time, Dr. Gabbert believed that Plaintiff suffered from muscle tension headaches. Tr. 228. The ALJ properly considered the fact that Plaintiff sought little medical treatment for migraines because such action, or inaction, indicates that the condition was not as limiting as she alleges. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (citing Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996)).

The ALJ also properly discounted Plaintiff's and her husband's credibility by analyzing their testimony with the objective medical evidence. She noted that only physician opined that Plaintiff's limitations rendered her unable to work; surgery was not recommended until recently by one physician; conservative treatment was utilized; Plaintiff sought treatment infrequently for her impairments; and the medical tests

9

indicated mild impairments. These findings contradict Plaintiff's and Plaintiff's husband's testimony that she is completely disabled. For these reasons, the ALJ properly evaluated Plaintiff's and her husband's credibility.

### *B. Treating Physician*

Plaintiff argues that the opinion of Dr. Egea, her treating neurologist, should have been afforded controlling weight. "[A] treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. Accordingly, an ALJ should give good reasons for discounting a treating physician's opinion." Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002) (quotations omitted). A treating physician's opinion should be discounted if other medical assessments are "supported by better or more thorough medical evidence." Cantrell v. Apfel, 231 F.3d 1104 (8th Cir. 2000) (citations omitted).

The ALJ afforded less weight to the opinion of Dr. Egea, especially with regard to the Medical Source Statements executed by him in 2002, because he had not treated Plaintiff since 1999. Tr. 19. According to the medical records, it appears that Plaintiff saw Dr. Egea in 1999 and then did not see him again until 2002. The MSS executed in 1999 indicated that Plaintiff could lift ten pounds repetitively but could not lift more than twenty pounds. Tr. 126. Because this MSS followed almost five months of treatment (rather than the lack of treatment that preceded the 2002 MSS), the ALJ afforded more weight to it.

With regard to the 2002 Mental MSS by Dr. Egea, the ALJ discounted it because Dr. Egea treated Plaintiff neurologically, not psychiatrically. Tr. 19-20. Claimant testified and the medical records support that Plaintiff does not suffer from a psychiatric impairment. Tr. 20. Furthermore, Dr. Egea did not treat Plaintiff from 1999 to 2002 and the assessment was not supported by medical notes or testing. The ALJ properly discounted the Mental MSS.

While most, if not all, of the physicians agree with Dr. Egea's diagnoses, none

10

them assessed her limitations as severely as Dr. Egea did in 2002 and, thus, Dr. Egea's opinion is not supported by the vast majority of the medical records. For example, Dr. Pratt opined that Plaintiff's only limitations were that she could lift no more than ten pounds and must avoid repetitive use of her arms and overhead activities. Tr. 137-39. Additionally, even Plaintiff's own assessment of her limitations do not support Dr. Egea's MSS; Plaintiff told Dr. Boda she could lift twenty pounds and could walk without difficulty. Tr. 197-205. The Court concludes the ALJ properly discounted the opinions and the 2002 MSS by Dr. Egea.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion is denied, and the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

Date: August 26, 2005 /s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

11